UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRANDON LOOMIS,<br><br>Plaintiff,<br><br>vs.<br><br>KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,<br><br>Defendant. | 5:21-CV-05005-KES<br><br>ORDER REVERSING COMMISSIONER'S DECISION AND REMANDING FOR RECONSIDERATION |

Plaintiff, Brandon Loomis, seeks review of the decision of the Commissioner of the Social Security Administration denying his claim for supplemental security income. Docket 20. The Commissioner opposes the motion and urges the court to affirm the denial of benefits. Docket 21. For the following reasons, the court reverses the decision of the Commissioner and remands for further consideration.

**FACTS**

**I.   Procedural Background**

Loomis filed an application for supplemental security income on January 4, 2018, at 21 years of age, alleging disability beginning June 27, 2014. AR 15, 23. Upon Loomis's request, a hearing was held on February 6, 2020, to further

develop the factual record. AR 33. The hearing was conducted by video conference, with Loomis appearing in person in Rapid City, South Dakota and the Administrative Law Judge (ALJ) connecting by video conference. *Id.* On March 6, 2020, the ALJ ruled against Loomis. AR 12. The Appeals Council denied Loomis's request for review on November 19, 2020. AR 1-4. Thus, Loomis's appeal of the Commissioner's final decision is properly before the court under 42 U.S.C. § 405(g).

## II.     Loomis's Medical and Occupational History

Loomis, now twenty-six years old, has schizophrenia spectrum disorder, depressive disorder, anxiety disorder, personality disorder, and post-traumatic stress disorder.[1] AR 17, 172. These conditions began in late adolescence during Loomis's junior year of high school. AR 283. Before the onset of these conditions, Loomis reported being at ease with himself and in social situations, including acting in school plays. AR 220, 404. Loomis did not graduate high school, which he explained is due to a "credit miscalculation." AR 285. Though he has expressed a desire to obtain his GED, the record does not indicate that he has done so. *Id.*

In July 2016, Loomis began work as a cashier and maintenance worker at a grocery store. AR 208. He stayed in the position until January 2017, when he was terminated due to repeated illness. AR 208, 293. Loomis explained that anxiety was causing nausea and vomiting before work, which led to absences.

---

[1] Loomis's treatment records also note a body mass index (BMI) value that classifies him as obese. Because this condition does not appear to cause any impairment, it is not discussed in the opinion.

*Id.* Loomis again found employment in August 2017 as a stocker in a convenience store. AR 208. He quit by the end of the month because of anxiety. AR 208, 293. Loomis has no further work history.

On October 30, 2017, Loomis sought care for anxiety and depression at the Behavior Management Crisis Care Center. AR 278-79. He described having panic attacks while in public with friends and was concerned about developing agoraphobia. AR 279. Russ Conti, a social worker at Behavior Management, consulted with Loomis on his initial visit and observed that Loomis was depressed and anxious. AR 278-79. Conti then referred Loomis to Rachel Pettersen, a professional counselor at the same treatment facility. *Id.* Pettersen saw Loomis the next day, and like Conti, she commented on Loomis's high level of anxiety. AR 287.

On November 13, 2017, Loomis first consulted with Peggy O'Connor, a certified nurse practitioner at Behavior Management. AR 292. O'Connor has been his primary mental health care provider since that time and has seen Loomis on twenty occasions between then and January 16, 2020. *See generally* AR 282-333, 359-86, 390-54. Throughout his visits with O'Connor, Loomis self-reported anxiety, depression, paranoia, hallucinations, difficulty with sleep, and panic when in public. AR 292, 329, 357. O'Connor observed that Loomis frequently displays an anxious or depressed mood. *E.g.*, AR 325, 364, 427. She also remarked on problems in concentration and memory, and partial insight. *E.g.*, AR 303, 364, 416.

Overall, the treatment records from O'Connor reflect that Loomis's conditions sometimes fluctuated in severity, but that Loomis made little to no sustained improvement. For example, in December of 2017, Loomis reported improved mood while on medication for depression. AR 329-32. One month later, however, he experienced paranoia and unexplained scratches on his legs, leading O'Connor to diagnose him with schizophrenia and adjust his medication. AR 324-28. His anxiety and depression then remained relatively consistent for the remaining first half of 2018, until a severe sense of panic and suicidal thoughts led him to admit himself to the hospital on September 17, 2018, where he spent several days before being released. AR 346-55. Though Loomis had his own apartment before being hospitalized, he lived primarily with his mother due to anxiety about being alone. AR 223, 283. Upon release from in-patient treatment, Loomis moved in full-time to his mother's house. AR 245.

Loomis's condition appeared to stabilize after admitting himself to the hospital but showed limited progress in the treatment records. *E.g.*, AR 363, 396. O'Connor noted few changes in his condition after that point, with the most notable fluctuations in mood being tied to external life events, such as his friends' divorce and his mother's decision to adopt a baby girl. AR 375, 415. In his last recorded appointment, on January 16, 2020, Loomis described continued stress, anxiety, and being overwhelmed. AR 450. O'Connor noted that Loomis had been taking care of his little sister and nephews since his

mother returned to work and that he could not afford some of his medications. AR 450, 453.

### III.  Loomis's Activities and Capacities

In his Function Report, Loomis described performing a variety of chores and personal care tasks around the home. For example, he can attend to personal hygiene such as bathing and can take medication with reminders from his mother. AR 217-18. He cooks simple meals for himself for lunch and performs housework such as doing the dishes, cleaning up, doing laundry, and mowing the lawn. AR 218-19. The frequency of each task and the time it takes him to perform them depend on his mood and energy. *Id.* Loomis's treatment records also note that he occasionally watches his nephews and baby sister. AR 308, 450.

Loomis occupies himself with numerous hobbies, which are documented in his Function Report, his treatment record, and in the hearing transcript. These hobbies include watching TV, listening to music, playing video games, and designing concept art. *E.g.*, AR 220, 284. He sometimes visits three or four friends at their homes. AR 43. He used to enjoy acting but is now too fearful of being seen by others. AR 220.

Loomis's activities outside the home are limited. He does not drive, because he is too fearful to obtain his driver's license. AR 44, 219, 228. He testified at his hearing that he sometimes goes with his mother to Wal-Mart for shopping, but that he can only stay in the store approximately ten minutes before his anxiety becomes overwhelming and he returns to the car. AR 43-44.

He does not like to go places alone and prefers to be accompanied by someone he knows well. AR 219.

## IV. The Five Step Procedure for Disability Determination

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416, 423(d)(1)(A); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled, and the inquiry ends at this step.
> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are severe, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled, and the inquiry ends at this step.
> **Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. If the applicant's impairment(s) are severe but do not meet or equal a Listed impairment, the ALJ must proceed to step four.

**Step Four:** Determine whether the applicant can perform past relevant work. To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, even those that are not severe, to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.
**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(f).

At step one, the ALJ found that Loomis "has not engaged in substantial gainful activity since January 4, 2018, the application date[.]" AR 17. At step two, the ALJ found that Loomis "has the following severe impairments: schizophrenia spectrum disorder; depressive disorder; anxiety disorder; personality disorder; and post-traumatic stress disorder[.]" *Id.* At step three, the ALJ found that Loomis's impairments, either individually or in combination, do not meet the severity of one of the listed impairments in 20 CFR Part 404, Subpart P Appendix 1. AR 18. At step four, the ALJ found that Loomis had no relevant work history. AR 23. At step five, the ALJ concluded that there are jobs in the national economy that Loomis could perform. AR 23-24. Thus, the ALJ found that Loomis is not disabled. *Id.*

## DISCUSSION

### I. Standard of Review

The court will affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole. *Choate v. Barnhart*, 457 F.3d

865, 869 (8th Cir. 2006) (citation omitted). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). "[T]his review is more than a rubber stamp of the . . . decision and is more than a search for the existence of substantial evidence supporting the . . . decision." *Piercy v. Browen*, 835 F.2d 190, 191 (8th Cir. 1987) (citation omitted). In reviewing the evidence, the court must accord weight both to the evidence which supports and detracts from the decision of the Commissioner. *See id.* But "[a]s long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because [this court] would have decided the case differently." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal citation omitted).

The court also reviews the Commissioner's decision de novo for legal error. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted).

## II.     The ALJ's Consideration of Brandon Loomis's Credibility

At steps four and five of the disability determination, the ALJ considered Loomis's functional residual capacity in order to assess what type of work, if any, he is able to perform in the national economy. The residual functional

capacity is "what the claimant can still do despite his physical or mental limitations." *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001) (cleaned up).

In this case, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms are not entirely consistent with the evidence." AR 20. The ALJ came to this conclusion after assessing Loomis's medical treatment history and pointing to alleged inconsistencies between Loomis's testimony and his daily activities. AR 19-22. The ALJ then held that Loomis's residual functional capacity allowed him to perform jobs outside the home that require "simple, routine tasks with only simple, work-related decisions and few workplace changes, and no public contact." AR 19.

To make this finding of residual functional capacity, the ALJ necessarily discounted the severity of two specific symptoms as described by Loomis: first, that he is unable to follow anything but one-step instructions; and second, that he is unable to regularly leave his home due to anxiety. Loomis argues that the ALJ's rejection of his testimony about the severity of his complaints is improper, and that his residual functional capacity is lower than that described by the ALJ. Docket 20 at 36-38.

"When evaluating a claimant's credibility as to subjective complaints, the ALJ must consider the *Polaski* factors." *Grindley v. Kijakazi*, 9 F.4th 622, 630 (8th Cir. 2021) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "Those factors include: the claimant's prior work history; daily activities;

9

duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Id.* (internal quotations omitted) (citing *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010)). The ALJ must consider each factor, "but d[oes] not have to discuss each one of them in relation to [the claimant], and he [is] permitted to discount [the] complaints if they were inconsistent with the evidence as a whole. When he discount[s] [the] complaints, however, the ALJ [i]s required to detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (internal citations and quotations omitted).

### A. Loomis's Ability to Follow Instructions

In the first portion of his residual functional capacity statement, the ALJ determined that Loomis is capable of "simple, routine tasks with only simple, work-related decisions and few workplace changes[.]" AR 19. This finding credits Loomis with a greater ability to follow instructions than his self-assessment that he can only follow one-step instructions. AR 221. *See also* AR 230 (corroborating concentration problems in a report from Renee Coots, Loomis's mother).

The ALJ discounted Loomis's testimony about his ability to follow instructions because it was inconsistent with his daily activities. As the ALJ noted, "[t]he claimant is able to engage in painting, reading, and video games. This shows some capacity for concentration and persistence." AR 20. The ALJ also stated that Loomis "was able to help watch over his nephews, despite

feeling fatigued and having related concentration difficulty." AR 21. As the Commissioner argues in his response, Loomis's ability to complete these tasks permissibly led the ALJ to conclude that an inconsistency existed between Loomis's actual and reported capacity for concentration. Docket 21 at 6; *see Heino v. Astrue*, 578 F.3d 873, 877-80 (8th Cir. 2009) (affirming the ALJ's dismissal of plaintiff's subjective complaints when plaintiff's claim that she could not carry ten pounds was inconsistent with daily activity of carrying nineteen-pound child).

Though not specifically cited by the ALJ, the reports of treatment providers further support that Loomis's ability to concentrate was impaired, but not to the degree he claims. In her analysis of Loomis's capacity for concentration, case manager Christine Allen found that Loomis has a mild impairment in his ability to understand and remember simple instructions, and no impairment in his ability to carry out simple instructions. AR 458. Rachel Pettersen, who worked with Loomis on setting and achieving life goals, found that he had no impairment at all concerning the ability to understand, remember, and carry out instructions. AR 455. Additionally, Peggy O'Connor remarked on concentration difficulties in her treatment notes, but at no point discusses an impediment so severe that it would preclude simple tasks. *E.g.,* AR 364.

Because a reasonable mind could find adequate support in the record for the ALJ's determination that Loomis can complete simple, routine tasks, the determination is supported by substantial evidence and must be upheld.

### B. Loomis's Anxiety about Leaving the House

In the second portion of his residual functional capacity determination, the ALJ found that Loomis could perform jobs that had "no public contact." AR 19, 24. The ALJ found no restriction on contact with supervisors or coworkers and found that Loomis is capable of jobs which take place outside of the home. *Id.* Specifically, the ALJ cited work as a commercial cleaner, dishwasher, and electronics worker as appropriate for someone with Loomis's residual functional capacity. AR 24. The ALJ again relied on apparent inconsistencies between Loomis's claims, his daily activities, and the reports of his treatment providers to assert that Loomis's level of anxiety of is not as high as was self-reported.

Throughout his report, the ALJ described Loomis as struggling with anxiety but making improvement over time. AR 20-22. This progress, however, is not documented in the record. Loomis had frequent adjustments to his medications and diagnoses, was hospitalized for suicidality in October 2018, and had only a single, minor improvement to his GAF score.[2] AR 288, 327-28, 332, 346-55, 367, 412. Additionally, specific details highlighted by the ALJ do

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational, and psychological functioning" in the context of mental illness. *Nowling v. Colvin*, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016) (quoting *Pate-Fires*, 564 F.3d at 937-38 n.1-3). The Social Security Agency and the Eighth Circuit have recognized that GAF scores are of "limited importance." *Id.* In his decision, the ALJ does not make any note of GAF scores, but the consistency of Loomis's GAF score undermines the ALJ's assertion that Loomis improved with treatment. Loomis's GAF score only increased once in the records, and only slightly from 63 to 65 on November 21, 2017. AR 288.

not represent the record as a whole and present a falsely optimistic portrayal of Loomis's condition.

      For example, the ALJ mentioned that, despite Loomis's claims of isolation, he "had also gone out in public with a friend." AR 21. But the ALJ failed to mention that Loomis had experienced panic attacks while at the event, which led him to seek treatment at Behavior Management Crisis Care Center. AR 279. The ALJ also stated that, apart from some anxiety, "other mental status examination findings in November 2017 were . . . within normal limits." AR 21. Loomis's thoughts, however, at his November 2017 appointment were described as containing "preoccupations/ruminations" that were "obsessional[,] depressive[,] paranoid[, and] self-deprecatory." AR 294.

      The ALJ went on to say that Loomis showed "no psychotic symptoms" in early 2018 and that his mood was usually normal during that period. AR 21. The treatment records do not support this conclusion. On January 8, 2018, Loomis reported paranoia, seeing shadows, and finding unexplained scratches on his legs. AR 324-28. He was diagnosed with schizophrenia the same day. *Id.* His mood was listed as normal less than half the time in the first half of 2018, with four of six comments on mood finding Loomis to be depressed, anxious, or both. AR 298, 303, 308, 315, 320, 325. Normal mood is rare within the treatment records as a whole, appearing only three times out of over twenty mentions of mood. *See* AR 294, 315, 320. Given that Loomis's anxiety and depression manifest as agoraphobia, his persistent anxious and depressed mood indicates continuing difficulty in leaving the house.

The ALJ must also consider, under the Social Security regulations, whether Loomis's daily functioning depends upon "special contexts," such as if he spends his time "among only familiar people or surroundings." Functioning in such an environment "does not necessarily show how [the claimant] would function in a work setting on a sustained basis, throughout a normal workday and workweek." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(3)(b). *See also Miller v. Colvin*, 2013 WL 4522302, at *11 (E.D. Mo. Aug. 27, 2013). For example, though Loomis is able to watch his nephews at home and is able to visit friends in private, familiar locations, neither of those activities is inconsistent with Loomis's claim that his functioning is much lower in public or around unfamiliar people.

The greatest support for the ALJ's finding that Loomis can leave his home comes from an April 2019 treatment report, where O'Connor noted that Loomis was "staying away from home more, and going out into public and [was] working on coping mechanisms that enable him to lengthen the time he stays out." AR 21, 396. O'Connor's note suggests progress, but to find that Loomis has the residual capacity to leave his home for work, the ALJ must determine that Loomis can leave his home more than incidentally. He must have "the ability to perform the requisite acts day in and day out, in the competitive and stressful conditions in which real people work in the real world." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989). The record does not establish that Loomis has such an ability to leave home. At the same April 2019 appointment, O'Connor found "no major changes" in Loomis's condition since their last visit.

14

AR 396. Loomis also appeared to have had little success in applying coping methods to lengthen his time away from home. He reported in his testimony that one of these methods, counting items while in public, only heightened his anxiety. AR 43-44. Combined with O'Connor's report that Loomis's anxiety again increased in January 2020, a single sentence remarking on improvement is not adequate to demonstrate that Loomis can regularly leave the house, and particularly not under stressful conditions. AR 450.

Because the ALJ does not identify the evidence in the record that supports a finding that Loomis can regularly leave his home and because none of Loomis's daily activities are inconsistent with the claim that he cannot, this court finds that the ALJ's determination is not supported by substantial evidence in the record.

### III. The ALJ's Dismissal of Peggy O'Connor's Corroborating Medical Opinion

By dismissing Loomis's subjective complaints, the ALJ also implicitly discounted the opinion of Loomis's treating practitioner, Peggy O'Connor. In an October 2018 questionnaire sent to Disability Determination Services, O'Connor remarked that Loomis's "ability to function outside his home is limited due to reported symptoms of panic" and that his "[a]ctivity outside of [the] home is mostly limited to attending scheduled [appointments]." AR at 356. The ALJ held that this report, which corroborates Loomis's testimony, is unpersuasive because O'Connor "does not analyze function-by-function limitations[.]" AR 22.

The ALJ, however, is required under 20 C.F.R. § 404.1520c[3] to consider five factors in assessing the credibility of a treating practitioner: supportability, consistency, relationship with the claimant, specialization, and other relevant factors. 20 C.F.R. § 404.1520c(c). Of these five factors, supportability and consistency are given the greatest weight. *Id.* Supportability considers the relevancy of the medical opinion, while consistency considers whether the opinion is in line with other medical and nonmedical sources. *Id.* Formatting the medical opinion into a function-by-function analysis is not statutorily required, and denial for this reason, without consideration of any other factor, constitutes an error of law.

## IV.  Type of Remand

Because "we are unable to determine whether substantial evidence supports the ALJ's finding," this court remands the question of claimant's credibility for further consideration and factfinding by the Commissioner. *Scott ex. rel. Scott v. Astrue*, 529 F.3d 818, 824 (8th Cir. 2008). Though Loomis argues that the case should be remanded for an award of benefits, this court's deference to the Commissioner requires that an award of benefits be ordered

---

[3] 20 C.F.R. § 404.1520c governs the ALJ's determination of medical opinions in this case because Loomis applied for benefits after March 27, 2017. The previous regulations required the ALJ to give the opinion of the treating provider "controlling weight," so long as the opinion was "well-supported" and "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Under the new regulations, the ALJ is not required to defer to the treating provider but must apply the statutory factors in determining the credibility of any provider. 20 C.F.R. § 404.1520. The regulations also continue to recognize that the medical source may have "a better understanding of [the claimant's] impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder." *Id.* at § 404.1520c(c)(3)(v).

only in the rare circumstances when the record overwhelmingly supports a finding of disability. *See Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997). As such, the court grants the Commissioner's request that the case be remanded for further consideration.

## CONCLUSION

Because the ALJ did not properly explain his reasons for dismissing Brandon Loomis's subjective complaint of agoraphobia and because the ALJ did not properly evaluate or explain the supportability and consistency of Peggy O'Connor's opinion, it is

ORDERED that the Commissioner's decision is reversed and remanded for reconsideration in accordance with this order.

Dated August 22, 2022

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE